## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **KATIE MOUNTAIN**, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | **COMPLAINT AND DEMAND** |
| | ) | **FOR JURY TRIAL** |
| **RANDALL LIBERTY**, Commissioner | ) | |
| Maine Department of Corrections | ) | **DECLARATORY AND** |
| | ) | **INJUNCTIVE RELIEF** |
| **BEN BEAL**, Warden | ) | **REQUESTED** |
| Maine Correctional Center, and | ) | |
| | ) | |
| **ANDREW BALCER**, | ) | |
| | ) | |
| Defendants | ) | |

## INTRODUCTION

Prison walls do not form a barrier separating prison inmates from the protections of the Constitution[1]. The First Amendment stands as a shield against any effort to enforce orthodoxy in thought or speech in this country[2].

This case challenges the constitutionality and application of a Maine state law, 34-A M.R.S. §1208-B, and related policies that require the Department of Corrections (DOC) to "affirm" the gender identity of convicted murderer Andrew Balcer by housing him in the women's facility and forcing female inmates to affirm his gender identity. This application

---

[1] Turner v. Safley, 482 U.S. 78, 84 (1987)
[2] Chiles v. Salazar, 607 U.S. ___ (2026) No. 24-539

demonstrates a reckless disregard for the safety, privacy and civil rights of female inmates like Katie Mountain.

## PARTIES

1.  Plaintiff Katie Mountain is a 41-year-old married Baptist woman from Dexter, Maine, serving a 10-month sentence for probation violation at the Maine Correctional Center in Windham.

2.  Defendant Randall Liberty, Commissioner of the Maine Department of Corrections, is sued in his official capacity for federal claims of prospective injunctive and declaratory relief, and in his individual capacity pursuant to the Maine Civil Rights Act.

3.  Defendant Ben Beal, the Warden of the Maine Correctional Center, likewise is sued in his official capacity for federal claims of prospective injunctive and declaratory relief, and in his individual capacity pursuant to the Maine Civil Rights Act.

4.  Defendant Andrew Balcer is a 27-year-old male serving a 40-year sentence for the gruesome murder of his parents in 2017. Since 2022, Balcer has been housed in the women's facility at the Maine Department of Corrections, sometimes referred to as the Women's Center.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 to award injunctive relief, and supplemental jurisdiction over state law claims under 28 U.S.C. § 1367. This Court is the appropriate venue for this action pursuant to 28 U.S.C. § 1391 because all the parties live in and the events giving rise to the lawsuit occurred and continue to occur in this District.

6.  Venue is proper under 28 U.S.C. § 1391 because the parties reside in this District and the events giving rise to the lawsuit occurred here.

## NATURE OF THE CASE

7. Female inmates at the MCC face two horrific choices: bunk with Andrew Balcer—a violent, "intact" male—and endure sexual assault and harassment, or face discipline and segregation for complaining.

8. Following the passage of 34-A M.R.S. § 1208-B(3), the DOC amended Policy 23.8 to require that housing placements be consistent with an inmate's "sincerely held core belief" regarding gender.

9. This new policy removed previous considerations regarding a prisoner's physical stature, tendency toward predatory behavior, or the safety of other prisoners.

10. While the previous policy aligned with the Prison Rape Elimination Act (PREA) by considering genital status and safety risks, the current policy mandates "gender affirmation" with little to no consideration for the biological women housed in these facilities.

## FACTUAL ALLEGATIONS

11. Katie Mountain, who is 5 feet 2 inches tall, was forced to bunk with Balcer, a 6-foot, 310-pound male.

12. While bunking together, Balcer subjected Mountain to graphic sexual stories, trapped her in a bathroom to forcibly kiss her, and made repeated threats of rape and impregnation.

13. Balcer talked disturbingly about putting a baby in her, and pointing to his crotch said, "look at my ten-man tent" and "we can't go for a ride, but you can ride me."

14. Balcer also sat next to Mountain's bed as she slept, telling her, "Don't worry, if you don't wake up it's because I smothered you with a pillow."

15. Mountain became so anxiety-ridden she had difficulty breathing, eating, and sleeping. In a constant state of heightened alert and fear, she told a corrections officer at the DOC that she

couldn't take living with Balcer anymore and would do anything -- including punching him in the mouth -- be free of him.

16.    As punishment for her refusal to be locked in the bunk with Balcer again and her alleged "threat," Mountain was transferred to segregation and denied medication, clean clothes, and hygiene supplies.

17.    In segregation Mountain is only allowed out of her room 3 hours a day and can't use the library, gym or art studio. She no longer is eligible for early release or home confinement. She is denied access to communal spaces and the store. She no longer can watch TV, take classes or crochet.

18.    "My roommate Andrea Balcer is still at the women's center living her best life. He assaults women like me, and they look the other way...The prison is doing nothing to stop him" Mountain wrote to The Maine Wire, a local online news outlet, when her cries for help at the DOC fell on deaf ears.

19.    The day after an article was published, a Maine Correctional Center guard, B, said to Mountain, "you just want your 15 minutes of fame. I bet you will put me in an article next."

20.    Mountain then became the target of retaliation by the DOC, that suddenly and repeatedly issued Mountain clothes that do not fit, burning her id on her shirt, raiding her cell and reading her legal paperwork, and denying her access to the Women's Center and prison privileges enjoyed by others as described above.

21.    When Mountain met with the Unit Manager, she asked him, "why are you covering for him? You know he is assaulting women! You know he has a dozen PREAs filed against him," she cried. The unit manager responded, "we don't make the laws."

22.    Katie Mountain's life growing up in rural Maine was one of hardship, poverty, and addiction. Life as a recovering addict is not easy and often shameful.

23.    Despite lapses and setbacks, Mountain strives every day to be a good person and known to be kind and tolerant of people who are of different faith, race, sex, and sexual orientation including people who identify as transgender.

24.    Despite her serious and earnest concerns about intolerable and unjust conditions of being imprisoned with and forced to salute, bunk and share intimate spaces with violent men, Mountain recognizes and is grateful for the several officers and staff members at the Maine Correction Center who do what they can within their authority to support her and treat all distraught female inmates with dignity and respect.

25.    Katie Mountain is a Baptist with a deep and abiding belief that men and women are created separately and equally in the image of God, and that she should not share intimate space including a bunk, bathroom and shower with a man who is not her husband.

26.    Women, according to Katie Mountain's sincerely and consistently held faith and Christians generally, possess inherent and unique dignity vital to God's story with distinct and holy roles.

27.    Katie Mountain prays every day and takes comfort in her beliefs that Jesus forgives her, and God loves her.

28.    It is against Katie Mountain's sincerely and consistently held religious beliefs as a Baptist and married woman to cohabitate with Andrew Balcer. It is against her religious beliefs and conscience to affirm the fiction that Andrew Balcer is "female" and refer to him as "her" and "she" because Balcer is not a woman and does not in any authentic way identify as one.

29.    Balcer's threats to impregnate Mountain, for example, and "make a baby" demonstrate his identity as a male rapist, not a woman, because a baby can only be made by the biological union of male and female gametes.

30.    To be compelled to affirm Andrew Balcer's false and/or delusional gender identity or face punishment is extremely distressing for Mountain and other female inmates abused by him.

31.    On the same block with Mountain at the Women's Center was another trans-identified male inmate, NV, serving 40 years for multiple counts of gross sexual assault on children. Mountain was so afraid of NV that she gave other female inmates coveted Pop-Tarts and Mountain Dew to accompany her to the bathroom to avoid being caught somewhere without cameras with him, including bathrooms and showers and sleeping areas.

32.    In addition to Mountain, multiple women have reported sexual harassment and assault committed by Balcer and other male inmates claiming a gender identity otherwise.

33.    MS is a sex trafficking victim in jail for possession of Fentanyl. MS was placed on the same block as Balcer and NV and was told by another inmate that while she was sleeping, Balcer had stroked her hair as well as the hair of another sleeping woman.

34.    While inmates were participating in an activity to make fudge, Balcer made creepy sexually suggestive remarks to MS including "Let me know if you want me to pack your fudge for you." Balcer lifted his shirt, then bounced up and down and yelled "Look at my nice tits!" Balcer repeated his threat to the women in his room, "If you don't wake up it's because I smothered you with a pillow."

35.    MS was extremely traumatized and complained to a DOC Sergeant E about Balcer's behavior, but Sergeant E did not make a record of her complaint and it went unaddressed.

36.     DF is another female inmate forced to bunk with Balcer at the Maine Corrections Center. Df is in jail for possession of Fentanyl. Incidents she experienced with Balcer included him and the crocheted doll he talks to and which he says he has put his soul into.

37.     Once, Balcer licked the doll suggestively between the legs and asked DF, "would you like it if I did that to you?" On another occasion DF woke up and Balcer was standing in the room naked, staring at her. Balcer later said to DF, "imagine what I could do to you in your sleep." DF was so upset that she sat in the bathroom for two hours to avoid him.

38.     Another time when DF was rinsing her hair in the shower, she saw the curtain drop back into place and when she asked the other inmates about is, they said Balcer had been in there.

39.     DF also was forced to room with trans-identifying male AB, who is serving 15 years for aggravated assault & drug trafficking. AB once demonstrated for the women in the room how he tucks his penis and secures it with tape.

40.     DF complained to corrections officers, C and F and to Sgt. F about the awful, intolerable, sexually charged, terrifying situation with trans-identifying males, but nothing was done.

41.     There are PREA (Prison Rape Elimination Act) signs hanging in the Maine Department of Corrections Center with an address in Augusta where inmates can write if they feel their PREA rights are being violated. DF and numerous women have written to it.

42.     DF now rooms with a female-to-male trans identified inmate, DA.

43.     Women who identify as men (such as DA) are housed in the Women's Center **and** men who allegedly identify as women (such as Balcer, NV and AB) are housed in the Women's Center.

44.     Mountain and DF have no problem with DA in the Women's Center because DA is female, regardless of gender identity.

45.     DA told DF that male inmates should not be in the women's prison.

46.     DF says all women who complain about males in the women's facility are sent to and kept in segregation with a loss of privileges while the men are allowed to stay in the Women's Center. "We are being punished because of our complaints."

47.     Another woman who complained about the trans-identified men in the prison, JA, achieved a level qualifying her to be taken out of segregation but when Sergeant E came to take her back to the Women's Center, five minutes later he brought her to back to segregation and said that women who had a problem with rooming with "trans women" i.e., men had to stay in segregation.

48.     JA had been assigned to the same room as Balcer. JA says the way Balcer treated her and other women "is very degrading and makes you feel gross and disgusting."

49.     Once JA hurt her back and Balcer offered to help her get down from the top bunk because he's tall, but then he pulled her close against him and "fingered my butt," as she decribed it, humiliated. JA could feel Balcer's penis against her and was very uncomfortable. Balcer told JA that he has a small penis "but it works".

50.     Once JA woke up and Balcer was sitting in a chair next to her bed, playing with her hair. JA had to ask Balcer to move the chair so she could get out of bed. Balcer said to her, "you look so beautiful. You don't know how much I want to kiss you right now."

51.     JA witnessed Balcer kissing the legs of another inmate, AM, while she was lying on her bunk. AM has mental health issues and much smaller than Balcer, and JA believes AM was too afraid to say 'no' to Balcer and that the incident was nonconsensual. This was very distressing to witness.

52.     Female inmate MR gave other women therapeutic back massages to ease tension and promote wellness. Balcer offered to give MR a massage and while MR was lying face down, Balcer rubbed down her sides to touch her breasts and rubbed her backside in a sexually inappropriate manner. MR was very uncomfortable and offended and made a complaint about it to Department of Corrections staff.

53.     MR was then placed in segregation and a mandatory mediation held. MR was pressured by the MCC to apologize and say it was a misunderstanding to get out of segregation, where the doors and windows don't open like they do in the Women's Center.

54.     Mountain has filed at least three grievances about the outrageous, cruel, and unusual conditions of her confinement, all of which resulted in a bureaucratic dead-end, dismissed or hung up on mandatory, unfair, face-to-face "mediation" between Balcer and Mountain.

55.     Two Native American women, upon information and belief, experienced and complained about men in the women's facility and Balcer's offensive, inappropriate and intolerable behavior. Nothing changed. Both have since been released.

56.     In addition to Mountain and the women identified above, upon information and belief, several additional women including two Native American women have reported sexual misconduct and sexual assault to the Maine Department of Corrections and the Maine Correctional Center since 34-A M.R.S. § 1208-B(3) was passed and enforced by Defendants Liberty and Beal when they knew or had reckless disregard for the safety, welfare, privacy and rights of Mountain and other female inmates were at substantial high risk.

57.     Despite repeated reports by women and their terrified families about the extreme anxiety, helplessness, fear, shame, and confusion created by the environment beholden to unfair, unlawful

gender identity laws and policies, the Maine Department of Corrections and Correctional Center did and continues to do nothing about it.

58.    Defendants Liberty and Beal know female inmates have a reasonable basis for alarm and fear of Balcer because they received multiple credible reports of being sexually assaulted, harassed and threatened with rape and death by him, but they continue to enforce 34-A M.R.S. § 1208-B(3) and DOC Policy 23.8 in reckless disregard of women's legitimate concerns.

59.    When Mountain became so desperate to avoid being locked in the room and forced to bunk and share a bathroom and shower with Balcer, she panicked and threatened to "smash him in the mouth" if they forced to return to the room and she was disciplined.

60.    In the "D Board" meeting Mountain had with DOC Captain RL, Mountain pled her case, telling the captain she went through the proper channels with grievances repeatedly to no avail. Because nothing changed and she was sexually assaulted and threatened with rape and was terrified and desperate, Mountain told the captain she threatened to smash Balcer in the face in self-defense and to be free from him.

61.    Mountain said to the captain in the D Board meeting, "what was I supposed to do, stay in that room and get raped?" The captain replied, "yes, you should have stayed in that room until the investigation was substantiated."

62.    Mountain then said to the captain, "I should have stayed in that room and got raped until the investigation was substantiated?" And the captain replied, "yes, you should have stayed in that room and got raped until the investigation was substantiated."

63.    Mountain's correctional level was reduced from 4 to 1 because she refused to bunk with Balcer and affirm his gender identity, making her ineligible for programs, exercise, fresh air and socialization.

64.     Mountain, an avid reader, gets only one book a week delivered to her segregated, tiny cell from a traveling librarian while Balcer gets free range and unlimited books at the DOC library.

65.     Andrew Balcer continues to enjoy the full panoply of perks, amenities, and privileges of living in the Women's Center – plus he enjoys special treatment, privileges and status because of his sex and gender identity.

66.     Mountain is suffering extreme physical and psychological distress. She is deprived of liberty, freedom of speech and thought, freedom to exercise her religious beliefs, privileges, and dignity because she is a woman and women are not protected from discrimination on the basis of sex at the Maine Correctional Center.

67.     Phone calls with her shocked and terrified parents and husband are spent crying. Mountain is extremely anxious, ashamed, afraid, lonely, and confused as to how this can be happening to herself and other female inmates. She seeks mental health care, is on anti-anxiety medications and depressants and has night terrors.

68.     Maine "gender identity" and "gender affirmation" laws and policies empower and enable Andrew Balcer to prey on and terrorize female inmates in the Maine Correctional Center and the Commissioner and Warden know it and are doing nothing about it.

69.     Upon information and belief, 8 men who claim a gender identity of "female" are currently housed at the women's facility of the Maine Correctional Center.

STATISTICAL AND LEGAL CONTEXT

70.     This case challenges the legality of 34-A M.R.S. § 1208-B(3) and DOC Policy 23.8 on their face and as applied to Mountain, seeks a declaratory judgment the law and policy are unconstitutional, and an injunction to stop ongoing enforcement.

71. This lawsuit also brings a private cause of action for damages including punitive damages against Andrew Balcer for assault and intentional infliction of emotional distress.

72. It's unlawful, cruel, discriminatory, false and an affront to the dignity of Katie Mountain and all women at the Maine Correctional Center who Balcer has sexually assaulted, harassed to be compelled to "affirm" his gender identity, amounting to compelled government orthodoxy.

73. Forced affirmation of Balcer's delusion or sham that he is a woman gives him unfair power he does not deserve and power exploits at Mountain's expense -- based on **his** belief system alone -- regardless how cognitively distorted.

74. There is no legitimate government interest in "affirming" Andrew Balcer's gender identity. It's an effort by the Maine Department of Correction to enforce viewpoint gender orthodoxy in thought and speech.

75. Center to Maine's gender orthodoxy is the concept of "gender identity," with a false premise that biological sex can change by sheer will.

76. Maine law requires the Maine Correctional Center to "maintain separate housing facilities for men and women." 34 A M.R.S. §3403.

77. 34-A M.R.S. §1208-B(3) requires the Department of Corrections to "affirm" the "gender identity" of Balcer, and that housing placements **must** be consistent with the person's consistently held gender identity except when such placement would present significant management or security problems to the jail or threaten the health **of the person**, with no consideration of the other inmates.

78. Prior to enactment of 34-A M.R.S. §1208-B(3), DOC Policy 23.8 "Management of Transgender and Intersex Prisoners" was, "in general, a prisoner shall be placed in a facility and

housing unit in accordance with his or her gender assigned at birth," except in certain instances, for instance if at the time of intake the prisoner had completed sex assignment surgery.

79.    Under the old DOC Policy 23.8, a prisoner such as Balcer who identified as transgender after intake, a recommendation on the request to transfer to the women's facility would be based on:

      a.    the gender of the prisoner assigned at birth;
      b.    the prisoner's views with respect to his or her own identity and safety and whether or not those views have been consistent;
      c.    the steps or lack of steps taken by the prisoner toward sexual reassignment;
      d.    **any relevant characteristics of the prisoner, including physical stature, any tendency toward violence or predatory behavior, and any vulnerability to violence or predatory behavior**;
      e.    any relevant characteristics of **other prisoners** with whom the person might be housed or come into contact;
      f.    correctional history (for example, any previous management problems that impacted on the safety of other persons or the security of the facility);
      g.    any co-occurring mental health issues; and
      h.    any perceived risks to the continuing safety and health of the prisoner **or others**.

80.    The old DOC policy aligns with PREA and fairly weighs the competing interests of men who want to invade women's spaces to abuse them and the women whose rights to privacy, safety and single-sex facilities will be threatened by it.

81.    Following passage of 34-A M.R.S. §1208-B(3), the Department of Corrections amended Policy 23.8 to include among other things a definition of "gender identity" that is "a person's sincerely held core belief regarding their gender, whether male, female, both, or neither."

82.    "Gender" is not defined in Maine law.

83.    There are, with rare exception that does not apply in this case, two human biological sexes, male and female, differentiated by unique reproductive systems, chromosomes, and gametes. Male humans ("men") have XY chromosomes and female humans ("women") have XX chromosomes.

84. No reasonable person could conclude Andrew Balcer has a "sincerely held core belief" that he is a female, and therefore a "she."

85. The amended DOC Policy 23.8 requires that "housing placement shall be consistent with the gender identity of the resident, except when placement in such housing would create a risk of safety, security, or orderly management of the facility, including but not limited to, a risk to the safety of other residents or a risk to the safety of the transgender or intersex resident."

86. No consideration was made by Defendants Liberty and Beals in enforcing 34-A M.R.S. §1208-B(3) and implementing the new Policy 23.8 of obvious, foreseeable and dangerous risks of locking Katie Mountain and other female inmates in a cell with Balcer.

87. The amended DOC Policy 23.8 requires strict adherence to gender orthodoxy with reckless disregard regard to women's safety, privacy, and rights, including pronouncements that "**under no circumstances**" may DOC "punish or impose or impose negative consequences due to behavior that is deemed to be gender nonconforming" even if the behavior is obscene, disturbing, sexually deviant and threatening.

88. The amended DOC Policy 23.8 also legislates gender orthodoxy by compelled speech for DOC staff **who require** Katie Mountain and other female inmates to refer to Andrew Balcer as "she" and affirm his gender identity.

89. The Maine Department of Corrections, a place of public accommodation, does recognize or enforce the rights of Katie Mountain and female inmates to be protected from discrimination on the basis of their sex, in violation of the Maine Human Rights Act, 5 M.R.S. § 4591, that states, "The opportunity for every individual to have equal access to places of public accommodation without discrimination because of race, color, **sex**, sexual orientation or gender

identity, age, physical or mental disability, religion, ancestry or national origin is recognized as and declared to be a civil right." (emphasis added)

90.     Department of Correction Policy 1.6 "Prohibition on Discrimination" states that "Discrimination based race, color, gender, sexual orientation, gender identity, ancestry, national origin, genetic information, age, physical or mental disability, religion, creed, marital status, political views, or whistleblower activity is a violation of Department policy. Discrimination based on these categories is unacceptable and will not be tolerated."

91.     In DOC records, Andrew Balcer and other male inmates are falsely categorized as "female" when the Department of Corrections knows their sex is male. This discriminates against women and evidence of impermissible government orthodoxy.

92.     Congress passed The Prison Rape Elimination Act of 2003 ("PREA") on September 4, 2003, to establish a zero-tolerance standard for prison rape in the United States. 41 U.S.C. § 15602(1). The Act sought to increase the accountability of prison officials who failed to detect, prevent, reduce, and punish prison rape," and to protect the Eighth Amendment rights of United States Prisoners. 41 U.S.C. § 15602(6).

93.     PREA recommends standards for inmate screenings to reduce the risk of victimization and abusiveness and to make individualized determinations on how to ensure the safety of each inmate by ensuring that trans-identifying inmates are not placed facilities or housing units based solely on their sexual orientation, genital status, or gender identity.

94.     Since 34-A M.R.S. §1208-B(3) was enacted, the number of reported PREA incidents of sexual misconduct at the Maine Correctional Center has almost quadrupled from 11 reports in year 2021 -- to 40 in year 2024.

95.    34-A M.R.S. §1208-B(3) and related DOC policies require all state facilities to "respect and acknowledge an incarcerated person's consistently held gender identity irrespective of anatomy or physique."

96.    The Gender ID law and related DOC policies further commands staff to address inmates according to their self-proclaimed gender identity and preferred pronouns.

97.    The DOC staff require female inmates – many of whom have been victimized by Balcer's **male** violence, sexual assaults and harassment and involuntary, routine exposure to his penis he weaponizes with threats of rape -- to **affirm his gender identity** or face punishment.

98.    Affirming the delusions of a sexual predator is psychological torture with no rational basis or legitimate government interest. Being forced to affirm the false belief that Andrew Balcer is a woman amounts to the imposition of an established orthodoxy or religion prohibited by the First Amendment.

99.    This action arises under 43 U.S.C. § 1983 in relation to Defendants Liberty and Beal in their official capacity's enforcement of the unlawful Gender ID law and related DOC rules and policies because they deprive Katie Mountain and all female inmates at the Maine Correctional Center of fundamental and clearly established rights under the First Amendment to freedom of thought, freedom of speech, freedom to worship, and protection from state-established orthodoxy and compelled speech.

100.    Mountain also alleges that the conditions at the Maine Correctional Center – granting the right of predatory men like Balcer to house in the women's pod, forcing Mountain to bunk with him despite his repeated threats, sexual assault, and sexual harassment, the failure to protect Mountain's rights on the basis of her sex, the religious discrimination, retaliation for speaking up, solitary confinement, gas lighting – all of it -- constitutes cruel and unusual punishment in

violation of Mountain's fundamental and clearly established rights under Eighth Amendment rights.

101.    Mountain alleges her fundamental and clearly established rights as a woman under the equal protection clause the Fourteenth Amendment haven been and continue to be violated.

102.    Mountain is also bringing a civil action against Andrew Balcer for assault, intentional infliction of emotional distress, and punitive damages.

103.    The necessity of housing male and female prisoners separately has long been recognized in the Geneva Conventions of 1949 and in the UN's 1955 Standard Minimum Rules for the Treatment of Prisoners (SMR), also known as the Nelson Mandela Rules. These guidelines have since formed the basis for international policymaking on prison management.

104.    Rule 11 of The United Nations Standard for Rules for the Treatment of Prisoners recommends that "[m]en and women shall so far as possible be detained in separate institutions; in an institution which receives both men and women, the whole of the premises allocated to women shall be entirely separate," because of the risk male inmates pose to female inmates.

105.    In the US, women are no longer protected by this common sense precaution. Laws such as 34-A M.R.S. §1208-B(3) have enabled transgender-identified individuals to request housing that aligns with their declared "gender identity," centered around the perceived risks to transgender-identified male prisoners. The foreseeable and resulting harm to female prisoners has received little, if any, attention.

106.    Transfers on the basis of "gender identity" are overwhelmingly, if not exclusively, utilized by male prisoners, the majority of whom have not undergone vaginoplasty; they are intact males who are able to regulate their sexual functioning by titrating or discontinuing their prescribed estrogen.

107.    A longitudinal study done by the Karolinska Institute in Sweden (1973-2003) demonstrated that even fully surgically transitioned males commit offenses at essentially the same rate as other males - a far higher rate than women.

108.    Trans-identified males transferring into women's prisons in Maine and elsewhere have seldom surgically transitioned - only around 10% of trans-identified men do so. The vast majority are intact males who are able to regulate their sexual functioning by titrating or discontinuing their prescribed estrogen.

109.    According to reports on 2023 FOI data from the Bureau of Prisons, almost 50% of trans-identified male inmates are in custody for sex offenses, compared to 11% of the general male population.

110.    According to 2023 data from the Bureau of Prisons, trans-identifying males are almost four times as likely to be incarcerated for a sexual offense as the general prison population (all men and women). At the high security level for federal inmates, data shows trans-identifying males are almost three times as likely to have a security level of "high" compared with the general prison population. It is also clear that sex offenders, disproportionate to other offenders, who would otherwise not identify as "trans" are doing so to game the system, like Balcer.

111.    Incarcerated women, including Katie Mountain, are a uniquely vulnerable population, experiencing high rates of mental illness and previous victimization, including childhood and adult sexual assault. Some studies note rates of previous trauma among female inmates as high as 90%. (Wright, et al., 2012; Bloom, Owen & Covington, 2005)

112.    Rates of sexual victimization are high enough to lead researchers to conclude that "sexual abuse may be a pathway to prison for women, likely through the development of mental illness, including substance abuse." (Sexual Victimization and Mental Illness Prevalence Rates Among

Incarcerated Women: A Literature Review Marie E. Karlsson, Melissa J Zielinski, Trauma Violence Abuse. 2018)

113.    Across the US, there have been numerous assaults on female inmates by trans-identified males. To cite just three examples: Tremaine Carroll will be standing trial later this year for the rape of three female inmates in the Central California Women's Facility; at the Rose M. Singer prison in New Jersey, Ramel "Diamond" Blount was convicted of the rape of a female inmate; Andre Patterson/Janiah Monroe at the Logan Correctional Center in IL accrued "multiple tickets, serious infractions, previous PREA allegations, inappropriate sexual behavior and a confirmed investigation that substantiated sexual misconduct" at Logan. "Her actions here at the facility … with her history, to me it is very concerning," said Glen Austin, warden at Logan during Monroe's residency there. All of these trans-identified male inmates had significant records of violent crimes against persons, yet all were cleared to enter women's prisons on the basis of their gender identities.

114.    The Maine Department of Corrections knows or should know the reported, obvious and inherent risks of placing violent men in locked cells with vulnerable women.

115.    Male inmates who are at risk of victimization can be protected in special units in the men's prison. Such vulnerable inmate units (VIUs) are standard practice in many prisons across the US. It was never necessary for the Maine Department of Corrections and Correctional Center to endanger women to protect men who identify as women or transgender.

116.    The U.S. Bureau of Federal Prisons reported as of December 2021 that approximately 48% of trans identifying biological male inmates have committed sex offenses, compared to 11.6% of general male inmate population.

117.    Canada's 2022 Correctional Service Research Report, Examination of Gender Diverse Offenders, examined data from 2017 to 2020 and reported that 64% of trans identifying biological male inmates had a "current sexual offense" conviction. Nearly 88% had a past sexual offense conviction, and 41% were imprisoned for homicide-related crimes—compared to only 21% of non-trans-identifying biological male inmates. 85% of trans-identifying biological males were convicted of violent crimes that caused either "serious harm" or death, and 58% of the victims of these crimes were women or children.

118.    A 2019 study in the United Kingdom reported that 58.9% of trans-identifying biological male inmates committed sex offenses, with 28% having committed rape and 18% having committed attempted rape.

## LEGAL CLAIMS

### Count One

**42 U.S.C. § 1983 – Violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment Against Defendants Liberty and Beal in Their Official Capacity**

119.    Plaintiff hereby incorporates by reference each of the preceding paragraphs and allegations as if fully set forth herein.

120.    Plaintiff Katie Mountain has a clearly established right under the Eighth Amendment to the United States Constitution to protection from cruel and unusual punishments, which is made applicable to the states through the Fourteenth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (1976).

121.    Prison officials violate the Eighth Amendment when they act with deliberate indifference to an inmate's health or safety. Deliberate indifference occurs when an "official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825 (1994).

122.    "The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. This scrutiny includes a duty on prison officials to provide "humane conditions of confinement," which encompasses "a duty ... to protect prisoners from violence at the hands of other prisoners." *Ayotte v. Barnhart, 973 F.Supp.2d 70, 78 (2013)*

123.    When a prison authority ignores a condition of confinement that is "sure or very likely to cause serious illness and needless suffering," a court can find an Eighth Amendment violation. *Helling v. McKinney*, 509 U.S. 25 (1993).

124.    By housing Andrew Balcer and other violent males with female inmates under circumstances described above, Defendants Liberty and Beal are deliberately indifferent to the substantial risk of serious harm shown by Mountain's Complaint, plus every report referenced herein, including the PREA Reports, grievances, and unofficial reports.

125.    The Department of Corrections and Maine Correctional Center's reckless disregard for safety, privacy and civil rights of Mountain is demonstrated by the statement of Captain RL, among other things described herein, when he said to Mountain, "yes, you should have stayed in that room and got raped until the investigation was substantiated."

126.    Plaintiff has no adequate remedy at law and does and will suffer serious and irreparable harm to her constitutional rights unless Defendants Liberty and Beal are enjoined from enforcing 34-A M.R.S. §1208-B(3) and DOC Policy 23.8 et als.

127.    Pursuant to 42 U.S.C. § 1983 and 1988, Plaintiff is entitled to declaratory relief, and temporary, preliminary, and permanent injunctive relief, invalidating and restraining enforcement of 34-A M.R.S. §1208-B(3) and DOC Policy 23.8

128.    Plaintiff also seeks an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

129.    Plaintiff has exhausted all administrative remedies as are available pursuant to 42 U.S.C. § 1997d.

### Count Two

### 42 U.S.C. § 1983 – Violation of the Free Speech Clause of the First Amendment and Retaliation for Protected Speech Against Defendants Liberty and Beal in Their Official Capacity

130.    Plaintiff hereby incorporates by reference each of the preceding paragraphs and allegations as if fully set forth herein.

131.    34-A M.R.S. §1208-B(3) and DOC Policy 23.8 violate the First Amendment both facially and as applied to Katie Mountain's clearly established rights to freedom of speech and rights to be protected from retaliation for protected speech that any reasonable official would have understood to be unlawful.

132.    Defendants chilled and otherwise violated Mountain's free speech rights by insisting under threat of punishment that she "affirm" the gender identity and refer to Andrew Balcer as "she" and "her" while he assaulted, harassed and threatened to rape her.

133.    Defendants violated Mountain's First Amendment rights when they punished her for speaking up about and sending a letter to the press about a matter of public concern, namely unbearable, unlawful conditions for female inmates at the Maine Correction Center.

134.    Because of her protected speech, Mountain is serving her sentence for a nonviolent crime in segregation, traumatized and denied virtually every privilege that makes being a prisoner bearable.

135.    Plaintiff also seeks an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### Count Three

### 42 U.S.C. § 1983 – Violation of the Freedom of Religion Clause of the First Amendment Against Defendants Liberty and Beal in Their Official Capacity

136.    Plaintiff hereby incorporates by reference each of the preceding paragraphs and allegations as if fully set forth herein.

137.    The facts as described herein constitute an ongoing violation by Defendants Liberty and Beal of Mountain's rights to religious freedom under the First Amendment.

138.    34-A M.R.S. §1208-B(3) and DOC Policy 23.8 facially and as applied to Mountain discriminate against her on the basis of her Baptist faith, and unlawfully compel her to adopt a gender orthodoxy that is inconsistent with her faith, conscience and reality of biological differences between men and women.

139.    34-A M.R.S. §1208-B(3) and DOC Policy 23.8 constitute an impermissible establishment of religion in violation of the First Amendment.

140.    The actions described herein by Defendants Liberty and Beal – forcing Mountain to bunk, shower with and affirm Balcer's gender identity have and continue to abridge her religious freedom and cause substantial harm.

141.    Plaintiff also seeks an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### Count Four

**42 U.S.C. § 1983 – Violation of the Equal Protection Clause of the Fourteenth Amendment Against Defendants Liberty and Beal in Their Official Capacity**

142.    Plaintiff hereby incorporates by reference each of the preceding paragraphs and allegations as if fully set forth herein.

143.    Defendants Liberty and Beal adherence to 34-A M.R.S. §1208-B(3) and DOC Policy 23.8 violates Plaintiff's equal protection secured by the Fourteenth Amendment to the U.S. Constitution.

144.    The Equal Protections clause requires that no state shall deny a person equal protection of the law and protects against discrimination against individuals based on arbitrary classification. *Engquist v. Oregon Dep't. of Agr.* 553 U.S. 591, 598 (2008).

145.    The Constitution's equal protection extends to prisoners, and prison officials cannot discriminate against prisoners based upon membership in a protected class. *Davis v. Powell*, 901 F. Supp. 2d 1196 (S.D. Cal. 2012).

146.    Discriminating against individuals on the bases of sex is only justified where there are "exceedingly persuasive" governmental objectives, and that the discriminatory means are substantially related to achieve the government's interest. *United States v. Virginia*, 518 U.S. 515, 116 S. Ct. 2264 (1996).

147.    Inherent differences between men and women exist, and "the two sexes are not fungible; a community made up exclusively of one sex is different from a community composed of both." *Id.* at 533 (citations omitted), S.B. 132 overlooks legitimate safety and security interest of female inmates by failing to house men and women inmates separate and apart from one another.

148.    There is no compelling government interest to house Andrew Balcer and other violent men with females at the Maine Correctional Center.

149.    There is no compelling government interest to house trans-identifying men in the women's facility and house trans-identifying women like in the women's facility.

150.    Lawful incarceration limits and revokes many privileges and rights of inmates, including the rights of prisoners to decide who to live and associate with, and inmates do not have the unbridled privilege to choose where to live as they would outside of penal institutions. *Jones*, 433 U.S. at 125.

151. The Maine law separating prisoners on the basis of biological sex, 34 A M.R.S. §3403, sex serves a legitimate penological purpose of protecting female inmates from violence and abuse by other inmates.

152. 34-A M.R.S. §1208-B(3) and DOC Policy 23.8, and as applied, violates the Equal Protection clause because it requires the Maine Department of Corrections and Correctional Center to place trans-identifying male inmates in single sex female prisons at their request, thereby discriminating against female inmates. 34-A M.R.S. §1208-B(3) and DOC Policy 23.8 requires the Defendants Liberty and Beal to value the preference of trans-identifying male inmates' housing preferences over the safety and security of female inmates, unconstitutionally impinging on the Plaintiffs' right to equal protection under the law.

153. Plaintiff has no adequate remedy at law and does and will suffer serious and irreparable harm to her constitutional rights unless Defendants are enjoined from enforcing 34-A M.R.S. §1208-B(3) and DOC Policy 23.8

154. Pursuant to 42 U.S.C. § 1983 and 1988, Plaintiffs are entitled to declaratory relief, and temporary, preliminary, and permanent injunctive relief, invalidating and restraining enforcement of 34-A M.R.S. §1208-B(3) and DOC Policy 23.8

155. Plaintiff also seeks an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### Count Five

**5 M.RS. § 4682 – Violation of the Maine Constitution's Free Speech Clause of the First Amendment and Retaliation for Protected Speech Against Defendants Liberty and Beal in Their Official and Individual Capacity**

156. Plaintiff hereby incorporates by reference each of the preceding paragraphs and allegations as if fully set forth herein.

157.    By committing the acts described herein, Defendants Liberty and Beal intentionally interfered with or attempted to interfere with Katie Mountain's rights secured by Article 1, Section 4 of the Constitution of the State of Maine, and unlawfully retaliated against her for exercising her speech rights.

158.    The acts of Defendants Liberty and Beal individually, as supervisors, and policy makers responsible for implementation and enforcement of 34-A M.R.S. §1208-B(3) and DOC Policy 23.8 have caused and continue to cause serious harm that was reasonably foreseeable in violation of Katie Mountain's clearly established rights.

159.    Pursuant to 5 M.R.S. § 4682 et seq. Mountain brings a claim for legal and equitable relief.

### Count Six

### 5 M.RS. § 4682 – Violation of the Maine Constitution's Religious Freedom Clause Against Defendants Liberty and Beal in Their Official and Individual Capacity

160.    Plaintiff hereby incorporates by reference each of the preceding paragraphs and allegations as if fully set forth herein.

161.    By committing the acts described herein, Defendants Liberty and Beal intentionally interfered with or attempted to interfere with Katie Mountain's rights secured by Article 1, Section 3 of the Constitution of the State of Maine, and unlawfully retaliated against her for exercising her rights.

162.    The acts of Defendants Liberty and Beal individually, as supervisors, and policy makers responsible for implementation and enforcement of 34-A M.R.S. §1208-B(3) and DOC Policy 23.8 have caused and continue to cause serious harm that was reasonably foreseeable in violation of Katie Mountain's clearly established rights.

163.    Pursuant to 5 M.R.S. § 4682 et seq. Mountain brings a claim for legal and equitable relief.

## Count Seven

**5 M.RS. §§ 4591, 4682 – Violation of the Maine Constitution's Equal Protection Clause and Human Rights Act Against Defendants Liberty and Beal in Their Official and Individual Capacity**

164.    Plaintiff hereby incorporates by reference each of the preceding paragraphs and allegations as if fully set forth herein.

165.    By committing the acts described herein, Defendants Liberty and Beal intentionally interfered with or attempted to interfere with Katie Mountain's rights secured by Article 1, Section 6-A of the Constitution of the State of Maine, and unlawfully retaliated against her for exercising her rights.

166.    The acts of Defendants Liberty and Beal individually, as supervisors, and policy makers responsible for implementation and enforcement of 34-A M.R.S. §1208-B(3) and DOC Policy 23.8  have caused and continue to cause serious harm that was reasonably foreseeable in violation of Katie Mountain's clearly established rights.

167.    Defendants Liberty and Beal knew or should have known that eliminating protection under Department of Corrections Policy 1.6 on the basis of sex violated Mountain's rights secured by the Maine Constitution and Maine Human Rights Act, 5 M.R.S. §4591.

168.    Pursuant to 5 M.R.S. § 4682 et seq. Mountain brings a claim for legal and equitable relief.

## Count Eight

**5 M.RS. § 4682 – Violation of the Maine Constitution's Clause Against Cruel and Unusual Punishment against Defendants Liberty and Beal in Their Official and Individual Capacity**

169.    Plaintiff hereby incorporates by reference each of the preceding paragraphs and allegations as if fully set forth herein.

170.    By committing the acts described herein, Defendants Liberty and Beal intentionally interfered with or attempted to interfere with Katie Mountain's rights secured by Article 1, Section 9 of the Constitution of the State of Maine.

171.    The acts of Defendants Liberty and Beal individually, as supervisors, and policy makers responsible for implementation and enforcement of 34-A M.R.S. §1208-B(3) and DOC Policy 23.8  have caused and continue to cause serious harm that was reasonably foreseeable in violation of Katie Mountain's clearly established rights.

172.    Pursuant to 5 M.R.S. § 4682 et seq. Mountain brings a claim for legal and equitable relief.

### Count Nine

### Assault, Intentional infliction of Emotional Distress, Punitive Damages against Andrew Balcer

173.    Plaintiff hereby incorporates by reference each of the preceding paragraphs and allegations as if fully set forth herein.

174.    By committing the above-described acts, Defendant Andrew Balcer is liable to Katie Mountain for assault.

175.    By committing the above-described acts, intentionally and with malice, Defendant Andrew Balcer is liable to Katie Mountain for intentional infliction of emotional distress.

176.    By committing the above-described acts, intentionally with malice, Defendant Andrew Balcer is liable to Katie Mountain for damages, including punitive damages.

**Demand For Jury Trial**

177.   Plaintiff demands a jury trial on all claims she has a right thereto.

**Prayer for Relief**

**WHEREFORE**, Plaintiff respectfully requests relief against Defendants as follows:

1.   An order and judgement declaring 34-A M.R.S. §1208-B(3) and DOC Policy 23.8, facially and as applied to Katie Mountain violate the Cruel and Unusual Punishment clauses of the U.S. and Maine Constitution; the Free Exercise of Religion and Establishment clauses of the U.S. and Maine Constitution; the Freedom of Speech Clauses of the U.S. and Maine Constitution; and the Equal Protections Clauses of the U.S. and Maine Constitution;

2.   An order permanently enjoining and prohibiting Defendants from enforcing 34-A M.R.S.§1208-B(3) and DOC Policy 23.8 or otherwise interfering with Plaintiff's federal and state constitutional rights and guarantees;

3.   Judgment and damages against Defendants Liberty and Beal and damages for violating the Maine Civil Rights Act.

4.   Judgement and damages against Andrew Balcer for assault, intentional infliction of emotional distress, including punitive damages.

5.   An award of damages - nominal, compensatory and punitive.

6.   Attorneys' fees and costs; and

7.   Such other and further relief as the Court deems appropriate and just.

Dated April 3, 2026                  /s/ *Cynthia A. Dill*
                                     Cynthia A. Dill
                                     Attorney for Plaintiff Katie Mountain

Maine Bar # 7055

The Law Office of Cynthia Dill
1227 Shore Road
Cape Elizabeth, Maine 04107
207-747-4172
cynthia@dillesquire.com