## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| KATIE MOUNTAIN,<br>JENNIFER ALBERT,<br>MICHAELA SARGENT, and<br>DANIELLE FOSTER,<br><br>       Plaintiffs<br>    v.<br><br>RANDALL LIBERTY, Commissioner<br>Maine Department of Corrections<br><br>BEN BEAL, Warden<br>Maine Correctional Center, and<br><br>ANDREW BALCER,<br><br>       Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **FIRST AMENDED COMPLAINT<br>DEMAND FOR JURY TRIAL,<br>DECLARATORY AND<br>INJUNCTIVE RELIEF**<br><br><br>**Docket No. 2:26-cv-00172-JAW** |

### INTRODUCTION

*Prison walls do not form a barrier separating prison inmates from the protections of the Constitution.* Turner v. Safley, 482 U.S. 78, 84 (1987).

This case challenges the constitutionality and application of a Maine state law, 34-A M.R.S. §1208-B(3), and related policies that require the Department of Corrections (DOC) to "affirm" the "gender identity" of convicted murderer Andrew Balcer -- and several other violent men -- by housing them in the women's facility at the Maine Correctional Center (MCC) and forcing everybody to call them women. The law applied to female plaintiffs Katie Mountain, Jennifer Albert, Michaela Sargent and Danielle Foster demonstrates its cruelty and the deliberate indifference to the safety, privacy, and civil rights of women incarcerated in the State of Maine.

## PARTIES

1. Plaintiff Katie Mountain is a 41-year-old, 135 lb. married Baptist woman from Dexter, Maine, serving a 10-month sentence at the Maine Correctional Center in Windham (MCC") for probation revocation following charges of burglary.

2. Plaintiff Jennifer Albert is a 45-year-old, 142 lb. Maine woman serving a 33-month sentence at the MCC for unlawful trafficking of scheduled drugs.

3. Michaela Sargent is a 30-year-old, 160 lb. Maine woman at the MCC for probation revocation following a charge of unlawful possession of fentanyl.

4. Plaintiff Danielle Foster is a 34-year-old, 170 lb. Maine woman incarcerated at MCC for violation of probation until May 5, 2026, for possession of fentanyl.

5. Defendant Randall Liberty, Commissioner of the Maine Department of Corrections, is sued in his official capacity for prospective injunctive and declaratory relief, and in his individual capacity pursuant to the Maine Civil Rights Act.

6. Defendant Ben Beal, the Warden of the Maine Correctional Center, is sued in his official capacity for prospective injunctive and declaratory relief, and in his individual capacity pursuant to the Maine Civil Rights Act.

7. Defendant Andrew Balcer is a 27-year-old, 310 lb. male serving a 40-year sentence at MCC for the gruesome murder of his parents in 2017. Since 2022, Balcer has been housed in the women's facility at MCC, sometimes referred to as the Women's Center.

## JURISDICTION AND VENUE

8. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 to award injunctive relief, and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

9.      This Court is the appropriate venue pursuant to 28 U.S.C. § 1391 because all the parties live in and the events giving rise to the lawsuit occurred and continue to occur in this District.

## NATURE OF THE CASE

10.     Female inmates including plaintiffs at the Maine Correctional Center face two very bad choices: bunk with Andrew Balcer, a violent, "intact" male predator, and endure his sexual assaults, threats, and harassment -- or face discipline and segregation for complaining about it.

11.     In 2019, the Maine Human Rights Act was amended in include "gender identity" as a protected status.

12.     "Gender identity" is defined as "the gender-related identity, appearance, mannerisms or other gender-related characteristics of an individual, regardless of the individual's assigned sex at birth."

13.     Since 2019, a partisan legislature and special interest groups have permeated Maine laws, regulations and policies with "gender identity," resulting in the erosion of protections for women and girls on the basis of sex.

14.     "Gender identity" is the keystone of Maine's state-sponsored gender orthodoxy that requires adherence to the belief that biological sex is irrelevant, mutable and can change by sheer will.

15.     In 2021, "gender identity" made its way into Title 34-A of Maine laws that govern corrections with passage of 34-A M.R.S. § 1208-B(3) ("Gender ID law").

16.      The Gender ID law prompted a change in DOC policies that now require housing placement of inmates to be consistent with their gender identity.

17.     While the previous policy aligned with the Prison Rape Elimination Act (PREA) by considering genital status and safety risks, the current policy mandates "gender affirmation" with little to no consideration for the biological women housed in these facilities.

18.     The amended Policy 23.8 removes previous considerations of a prisoner's physical stature, tendency toward predatory behavior, or the safety of other prisoners in determining housing placement.

19.     In addition to the significant change in housing policy resulting in males being housed with females, MCC Policy on Prohibition on Discrimination no longer recognizes protection on the basis of their sex.

20.     "Sex" has been replaced with "gender identity" and that unlawfully discriminates against plaintiffs based on their sex. No longer in Maine law is there boundaries that clearly define "male" and "female," therefore the female sex cannot be protected.

21.     Enforcement of the Gender ID law discriminates against and compels plaintiffs to say what is not true, to affirm what they do not believe, and subjects them to cruel and unusual punishment.

## FACTUAL ALLEGATIONS

**Katie Mountain**

22.     Katie Mountain was housed with Balcer when she arrived to serve her 10-month sentence in January of 2026.

23.     While bunking together, Balcer subjected Mountain to graphic sexual stories, trapped her in a bathroom, pushed her against the wall, forcibly kissed her, and made repeated threats of rape and impregnation.

24.    Balcer talked disturbingly about putting a baby in Mountain, and pointing to his crotch said things like, "look at my ten-man tent" and "we can't go for a ride, but you can ride me."

25.    Balcer also sat next to Mountain's bed as she slept, telling her, "Don't worry, if you don't wake up it's because I smothered you with a pillow," a comment he makes often and thinks is funny.

26.    Mountain became so anxiety-ridden she had difficulty breathing, eating, and sleeping. In a constant state of heightened alert and fear, she told a corrections officer at the DOC that she couldn't take living with Balcer anymore and would do anything -- including punching him in the mouth -- be free of him.

27.    As punishment for her refusal to be housed with Balcer and affirm his gender identity, Mountain was transferred to segregation and denied medication, clean clothes, and hygiene supplies.

28.    In segregation Mountain is only allowed out of her room 3 hours a day and can't use the library, gym or art studio. She no longer is eligible for early release or home confinement. She is denied access to communal spaces and the store. She no longer can watch TV, take classes or crochet.

29.    "My roommate Andrea Balcer is still at the women's center living her best life. He assaults women like me, and they look the other way...The prison is doing nothing to stop him" Mountain wrote to The Maine Wire, a local online news outlet, when her cries for help at the DOC fell on deaf ears.

30.    The day after an article was published, a Maine Correctional Center guard, B, said to Mountain, "you just want your 15 minutes of fame. I bet you will put me in an article next."

31.    Mountain then became the target of retaliation by the DOC, that suddenly and repeatedly issued Mountain clothes that do not fit, burning her id on her shirt, raiding her cell and reading her legal paperwork, and denying her access to the Women's Center and prison privileges enjoyed by others as described above.

32.    When Mountain met with the Unit Manager, she asked him, "why are you covering for him? You know he is assaulting women! You know he has a dozen PREAs filed against him!" The Unit Manager responded, "we don't make the laws."

33.    Katie Mountain's life growing up in rural Maine was one of hardship, poverty, and addiction. Life as a recovering addict is not easy and often shameful.

34.    Despite lapses and setbacks, Mountain strives every day to be a good person and known to be kind and tolerant of people who are of different faith, race, sex, and sexual orientation including people who identify as transgender.

35.    Mountain is a Baptist with a deep and abiding belief that men and women are created separately and equally in the image of God, and that she should not share intimate space including a bunk, bathroom and shower with a man who is not her husband.

36.    Women, according to Katie Mountain's sincerely and consistently held faith and Christians generally, possess inherent and unique dignity vital to God's story with distinct and holy roles.

37.    Mountain prays every day and it is against Katie Mountain's sincerely and consistently held religious beliefs as a Baptist and married woman to cohabitate with Andrew Balcer.

38.    It is against Mountain's sincerely held religious beliefs and her conscience to affirm the fiction that Andrew Balcer is "female" and refer to him as "her" and "she" because Balcer is not a woman and does not in any authentic way identify as one.

39.     Balcer's threats to impregnate Mountain, for example, and "make a baby" demonstrate his identity as a male rapist, not a woman, because a baby can only be made by the biological union of male and female gametes.

40.     Mountain has filed at least three grievances about the outrageous, cruel, discriminatory and unusual conditions of her confinement, all of which resulted in a bureaucratic dead-end, dismissed or hung up on mandatory, unfair, face-to-face "mediation" between Balcer and Mountain.

41.     On the same block with Mountain at the Women's Center was another trans-identified male inmate, NV, serving 40 years for multiple counts of gross sexual assault on children. Mountain was so afraid of NV that she gave other female inmates coveted Pop-Tarts and Mountain Dew to accompany her to the bathroom to avoid being caught somewhere without cameras with him, including bathrooms and showers and sleeping areas.

42.     In the disciplinary meeting with MCC Captain RL, Mountain pled her case, telling the captain she went through the proper channels with grievances repeatedly to no avail and because nothing changed and she was sexually assaulted and threatened with rape and was terrified and desperate, she threatened to punch Balcer in the face in self-defense to be free from him.

43.     Mountain said to the MCC captain, "what was I supposed to do, stay in that room and get raped?" And the captain replied, "yes, you should have stayed in that room until the investigation was substantiated."

44.     Mountain then said, "I should have stayed in that room and got raped until the investigation was substantiated?" And the captain replied, "yes, you should have stayed in that room and got raped until the investigation was substantiated."

45.     Mountain's correctional level was reduced from 4 to 1 as discipline because she refused to bunk with Balcer and affirm his gender identity -- making her ineligible for programs, exercise, fresh air and socialization.

46.     Mountain, an avid reader, gets only one book a week delivered to her segregated, tiny cell from a traveling librarian while Balcer gets free range and unlimited books at the DOC library.

47.     Andrew Balcer continues to enjoy the full panoply of perks, amenities, and privileges of living in the Women's Center – plus he enjoys special treatment, privileges and status because of his sex and gender identity.

48.     Mountain is suffering extreme physical and psychological distress. She is deprived of liberty, freedom of speech and thought, freedom to exercise her religious beliefs, privileges, and dignity because she is a woman and women are not protected from discrimination on the basis of sex at the Maine Correctional Center.

49.     Phone calls with her shocked and terrified parents and husband are spent crying. Mountain is extremely anxious, ashamed, afraid, lonely, and confused as to how this can be happening to herself and other female inmates. She seeks mental health care, is on anti-anxiety medications and depressants and has night terrors.

50.     In addition to Mountain, multiple women have reported sexual harassment and assault committed by Balcer and other male inmates claiming a gender identity otherwise.

**Michaela Sargent**

51.     Michaela Sargent is a sex trafficking and kidnapping victim in jail for possession of Fentanyl.

52.     Once Sargent woke up to Balcer stroking her hair and making the disturbing and threatening comment, "if you don't wake up it's because I smothered you with a pillow."

53.     Balcer routinely made other creepy threatening remarks to Sargent, including "I will pack your fudge" and "thank god I do not have to make a Mother's Day card" and other references to murdering his parents and dog.

54.     In Sargent's presence, Balcer lifted his shirt and bounced up and down and yelled, "look at my nice tits!" and then grabbed Sargent's shirt and demanded, "show me your boobs!"

55.     Balcer hit Sargent with a tea bag while making an obscene gesture, saying, "have you ever been tea-bagged?"

56.     NV, another male convicted of gross sexual assault and housed in the MCC women's facility, pulled Sargent on his lap against her will several times.

57.     For complaining about Balcer and reporting assault and harassment, Sargent was put in segregation. She cannot go to church. She cannot go outside, or to the gym, or open windows for fresh air.

58.     For reporting the assaults and harassment by Balcer, and refusing to "affirm" his "gender identity" Sargent was retaliated against at the MCC and accused of being "transphobic."

59.     Sargent gave a recorded statement about the assaults and harassment by Balcer to the MCC, but nothing was done.

**Danielle Foster**

60.     Danielle Foster was housed with Balcer when another inmate, Alison, was removed from Balcer's quad for complaining about him.

61.      Incidents Foster experienced with Balcer (and reported to MCC) included him and the crocheted doll he talks to and says he has put his soul into.

62.     Once, Balcer licked the doll suggestively between the legs and asked Foster, "would you like it if I did that to you?" On another occasion Foster woke up and Balcer was standing in the

room naked, very close and staring at her. Balcer then said, "imagine what I could do to you in your sleep." Foster was unsure if he was threatening to something sexual or violent. She was so upset that she sat in the bathroom for two hours to avoid him.

63.     Another time when Foster was rinsing her hair in the shower, she saw the curtain drop back into place and when she asked the other inmates about it, they said Balcer had been in the shower stall.

64.     Foster was also forced to be housed with trans-identifying male AB, who is serving 15 years for aggravated assault & drug trafficking. AB once demonstrated for the women in the room how he tucks his penis and secures it with tape.

65.     Foster complained to corrections officers, C and F and to Sgt. F about the awful, intolerable, sexually charged, terrifying situation with trans-identifying males, but nothing was done.

66.     There are PREA (Prison Rape Elimination Act) signs hanging in the Maine Department of Corrections Center with an address in Augusta where inmates can write if they feel their PREA rights are being violated. Foster and numerous female inmates at MCC have written to it – mostly, upon information and belief, about Balcer and other males housed in the women's facility.

67.     Foster presently rooms with a female-to-male trans identified inmate, DA.

68.     Women who identify as men (such as DA) are housed in the Women's Center at MCC **and** men who allegedly identify as women (such as Balcer, NV and AB) are housed in the Women's Center at MCC.

69.     Male inmates at MCC have a single-sex facility. Females at MCC do not have a single-sex facility.

70.     Foster alleges all women who complain about males in the women's facility, including her, are sent to and kept in segregation with a loss of privileges while the men are allowed to stay in the Women's Center that has far superior and dignified living conditions. "We are being punished because of our complaints."

**Jennifer Albert**

71.     Albert was also assigned to the same room as Balcer. The way Balcer treats Albert and other female inmates is "very degrading and makes you feel gross and disgusting."

72.     Once after Albert seriously hurt her back, Balcer offered to "help" her get down from the top bunk but then pulled her close against him and "fingered my butt," as she describes the assault, humiliated. Albert could feel Balcer's penis against her and was extremely uncomfortable and distressed about the unwanted menacing sexual contact. Balcer told Albert he has a small penis "but it works".

73.     Another time Albert woke up and Balcer was sitting in a chair next to her bunk playing with her hair. Albert was alarmed and had to tell Balcer to move the chair so she could get out of bed and he said to her, "you look so beautiful. You don't know how much I want to kiss you right now." Albert was very frightened for her safety.

74.     Albert witnessed Balcer kissing the legs of another female inmate, AM, while she was lying on her bunk. AM has mental health issues, is very vulnerable and much smaller than Balcer. Albert believes AM was in shock and too afraid to say 'no' to Balcer and that the incident was nonconsensual. This was very distressing for Albert to witness.

75.     Albert complained about Balcer and the trans-identified men at the MCC and was moved to segregation as a result.

76.     When Albert achieved a level qualifying her to be taken out of segregation, Sergeant E took Albert back to the Women's Center but five minutes later brought her to back to segregation and said that women who have a problem rooming with "trans women" i.e., men had to stay in segregation.

77.     Another female inmate MR gave other women therapeutic back massages in the women's facility at MCC to help ease tension and promote wellness. Balcer offered to give MR a massage and while MR was lying face down, Balcer rubbed down her sides to touch her breasts and rubbed her backside in a sexually inappropriate manner. MR was very uncomfortable and offended and made a complaint about it to MCC staff.

78.     MR was then placed in segregation and a mandatory mediation held. MR was pressured by the MCC to apologize and say it was a misunderstanding to get out of segregation, where the doors and windows don't open like they do in the Women's Center.

79.     In addition to plaintiffs and other women identified above, multiple other women including two Native Americans have reported discrimination, sexual misconduct and sexual assault to the Maine Department of Corrections and the Maine Correctional Center since 34-A M.R.S. § 1208-B(3) was passed and enforced by Defendants Liberty and Beal.

80.     Despite multiple and repeated reports by plaintiffs and other women and their terrified families about the abuse, anxiety, helplessness, fear, shame, and confusion created by the environment beholden to unfair, unlawful Gender Identity laws and policies, the Maine Department of Corrections and Maine Correctional Center did and continue to do nothing about it.

81.     Defendants Liberty and Beal know female inmates are being discriminated against, threatened, assaulted and harassed but they continue to enforce 34-A M.R.S. § 1208-B(3) and DOC Policy 23.8 with deliberate indifference for plaintiffs' legitimate concerns.

82.     Upon information and belief, 8 men who claim a gender identity of "female" are housed at the women's facility of the Maine Correctional Center. None of the female inmates who claim a gender identity of male are housed on the men's facility.

## STATISTICAL AND LEGAL CONTEXT

83.     Maine law requires the Maine Correctional Center to "maintain separate housing facilities for men and women." 34 A M.R.S. §3403.

84.     34-A M.R.S. §1208-B(3) requires the Department of Corrections to "affirm" the "gender identity" of men like Balcer. Housing placements **must** be consistent with the person's consistently held gender identity except when such placement would present significant management or security problems to the jail or threaten the health **of the person** -- with no consideration of the health and safety of other inmates.

85.     Prior to enactment of 34-A M.R.S. §1208-B(3), DOC Policy 23.8 "Management of Transgender and Intersex Prisoners" was, "in general, a prisoner shall be placed in a facility and housing unit in accordance with his or her gender assigned at birth," except in certain instances, for instance if at the time of intake the prisoner had completed sex assignment surgery.

86.     Under the old DOC Policy 23.8, when a prisoner like Balcer who identifies as transgender after intake, a recommendation on the request to transfer to the women's facility would be based on:

    a.   the gender of the prisoner assigned at birth;
    b.   the prisoner's views with respect to his or her own identity and safety and whether or not those views have been consistent;
    c.   the steps or lack of steps taken by the prisoner toward sexual reassignment;

  d. **any relevant characteristics of the prisoner, including physical stature, any tendency toward violence or predatory behavior, and any vulnerability to violence or predatory behavior**;

  e. any relevant characteristics of **other prisoners** with whom the person might be housed or come into contact;

  f. correctional history (for example, any previous management problems that impacted on the safety of other persons or the security of the facility);

  g. any co-occurring mental health issues; and

  h. any perceived risks to the continuing safety and health of the prisoner **or others**.

87. The old DOC policy aligns with PREA and fairly weighs the competing interests of men who want to invade women's spaces to abuse them and the women whose rights to privacy, safety and single-sex facilities will be threatened by it.

88. Following passage of 34-A M.R.S. §1208-B(3), the Department of Corrections amended Policy 23.8 to include among other things a definition of "gender identity" that is "a person's sincerely held core belief regarding their gender, whether male, female, both, or neither."

89. "Gender" is not defined in Maine law.

90. No reasonable person could conclude Andrew Balcer has a "sincerely held core belief" that he is a female, and therefore a "she."

91. There are, with rare exception that does not apply in this case, two human biological sexes, male and female, differentiated by unique reproductive systems, chromosomes, and gametes. Male humans ("men") produce sperm and have XY chromosomes and female humans ("women") produce eggs, give birth and have XX chromosomes.

92. Biological sex is immutable and does not change with surgery or hormone treatment.

93. By enforcing 34-A M.R.S. §1208-B(3) and implementing the Policies 1.6 and 23.8 Defendants Liberty and Beal are deliberately indifferent to the obvious, foreseeable and dangerous risks of housing plaintiffs and other female inmates with males like Balcer.

94. The amended DOC Policy 23.8 that requires strict adherence to a state-sponsored gender orthodoxy shows deliberate indifference and reckless disregard regard for the safety, privacy, and civil rights of women, including the pronouncement that "**under no circumstances**" may DOC "punish or impose or impose negative consequences due to behavior that is deemed to be gender nonconforming" even if the behavior is obscene, disturbing, sexually deviant and threatening.

95. The amended DOC Policy 23.8 also legislates gender orthodoxy by compelled speech for DOC staff **who require** plaintiffs and all other female inmates to refer to Andrew Balcer as "she" and affirm his gender identity against their will.

96. The MCC, a place of public accommodation, has a written policy that does not recognize or enforce the rights of plaintiffs to be protected from discrimination on the basis of their female sex, in violation of the Maine Human Rights Act.

97. 5 M.R.S. § 4591 states, "The opportunity for every individual to have equal access to places of public accommodation without discrimination because of race, color, **sex**, sexual orientation or gender identity, age, physical or mental disability, religion, ancestry or national origin is recognized as and declared to be a civil right." (emphasis added)

98. Department of Correction Policy 1.6 "Prohibition on Discrimination" eliminated the "sex" class altogether from protection – as a routine and technical rule – that plaintiffs allege is unauthorized, unlawful and discriminatory.

99. DOC Policy 1.6 states that "Discrimination based race, color, gender, sexual orientation, gender identity, ancestry, national origin, genetic information, age, physical or mental disability, religion, creed, marital status, political views, or whistleblower activity is a violation of

Department policy. Discrimination based on these categories is unacceptable and will not be tolerated."

100.    In DOC records, Andrew Balcer and other **male** inmates are falsely categorized as "female" when defendants know their sex is male. False record-keeping to adhere to Maine's state-sponsored gender orthodoxy skews statistics and discriminates against women.

101.    Congress passed The Prison Rape Elimination Act of 2003 ("PREA") on September 4, 2003, to establish a zero-tolerance standard for prison rape in the United States. 41 U.S.C. § 15602(1). The Act sought to increase the accountability of prison officials who failed to detect, prevent, reduce, and punish prison rape," and to protect the Eighth Amendment rights of United States Prisoners. 41 U.S.C. § 15602(6).

102.    PREA recommends standards for inmate screenings to reduce the risk of victimization and abusiveness and to make individualized determinations on how to ensure the safety of each inmate by ensuring that trans-identifying inmates are not placed facilities or housing units based solely on their sexual orientation, genital status, or gender identity.

103.    Since 34-A M.R.S. §1208-B(3) was enacted, the number of reported PREA incidents of sexual misconduct at the Maine Correctional Center has almost quadrupled from 11 reports in year 2021 -- to 40 in year 2024.

104.    The MCC has deemed most of these reports "unfounded" because female inmates including plaintiffs refuse to participate in the MCC mandatory mediation program that requires a personal confrontation with the male offender and an "apology."

105.    34-A M.R.S. §1208-B(3) and related DOC policies require all state facilities to "respect and acknowledge an incarcerated person's consistently held gender identity irrespective of anatomy or physique."

106.    The necessity of housing male and female prisoners separately has long been recognized in the Geneva Conventions of 1949 and in the UN's 1955 Standard Minimum Rules for the Treatment of Prisoners (SMR), also known as the Nelson Mandela Rules. These guidelines have since formed the basis for international policymaking on prison management.

107.    Rule 11 of The United Nations Standard for Rules for the Treatment of Prisoners recommends that "[m]en and women shall so far as possible be detained in separate institutions; in an institution which receives both men and women, the whole of the premises allocated to women shall be entirely separate," because of the risk male inmates pose to female inmates.

108.    A longitudinal study done by the Karolinska Institute in Sweden (1973-2003) demonstrated that even fully surgically transitioned males commit offenses at essentially the same rate as other males - a far higher rate than women.

109.    Trans-identified males transferring into women's prisons in Maine and elsewhere have seldom surgically transitioned - only around 10% of trans-identified men do so. The vast majority are intact males who are able to regulate their sexual functioning by titrating or discontinuing their prescribed estrogen.

110.    According to reports on 2023 FOI data from the Bureau of Prisons, almost 50% of trans-identified male inmates are in custody for sex offenses, compared to 11% of the general male population.

111.    According to 2023 data from the Bureau of Prisons, trans-identifying males are almost four times as likely to be incarcerated for a sexual offense as the general prison population (all men and women). At the high security level for federal inmates, data shows trans-identifying males are almost three times as likely to have a security level of "high" compared with the

general prison population. It is also clear that sex offenders, disproportionate to other offenders, who would otherwise not identify as "trans" are doing so to game the system, like Balcer.

112.    Incarcerated women, including plaintiffs, are a uniquely vulnerable population, experiencing high rates of mental illness and previous victimization, including childhood and adult abuse, neglect, trafficking and sexual assault. Some studies note rates of previous trauma among female inmates as high as 90%. (Wright, et al., 2012; Bloom, Owen & Covington, 2005)

113.    Rates of sexual victimization are high enough to lead researchers to conclude that "sexual abuse may be a pathway to prison for women, likely through the development of mental illness, including substance abuse." (Sexual Victimization and Mental Illness Prevalence Rates Among Incarcerated Women: A Literature Review Marie E. Karlsson, Melissa J Zielinski, Trauma Violence Abuse. 2018)

114.    Across the US, there have been numerous assaults on female inmates by trans-identified males. To cite just three examples: Tremaine Carroll will be standing trial later this year for the rape of three female inmates in the Central California Women's Facility; at the Rose M. Singer prison in New Jersey, Ramel "Diamond" Blount was convicted of the rape of a female inmate; and Andre Patterson/Janiah Monroe at the Logan Correctional Center in IL accrued "multiple tickets, serious infractions, previous PREA allegations, inappropriate sexual behavior and a confirmed investigation that substantiated sexual misconduct" at Logan. All of these trans-identified male inmates had significant records of violent crimes against persons, yet all were cleared to enter women's prisons on the basis of their gender identities.

115.    Male inmates with a gender identity that puts them at risk of victimization in the men's facility can be protected in special units. Such vulnerable inmate units (VIUs) are standard practice in many prisons across the US.

116.     Canada's 2022 Correctional Service Research Report, Examination of Gender Diverse Offenders, examined data from 2017 to 2020 and reported that 64% of trans identifying biological male inmates had a "current sexual offense" conviction. Nearly 88% had a past sexual offense conviction, and 41% were imprisoned for homicide-related crimes—compared to only 21% of non-trans-identifying biological male inmates. 85% of trans-identifying biological males were convicted of violent crimes that caused either "serious harm" or death, and 58% of the victims of these crimes were women or children.

117.     A 2019 study in the United Kingdom reported that 58.9% of trans-identifying biological male inmates committed sex offenses, with 28% having committed rape and 18% having committed attempted rape.

## LEGAL CLAIMS

### Count One

### 42 U.S.C. § 1983 – Violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment Against Defendants Liberty and Beal in Their Official Capacity

118.     Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

119.     Plaintiffs have a clearly established right under the Eighth Amendment to the United States Constitution to be protected from cruel and unusual punishment, which is made applicable to the states through the Fourteenth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (1976).

120.     Prison officials violate the Eighth Amendment when they act with deliberate indifference to an inmate's health or safety. Deliberate indifference occurs when an "official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825 (1994).

121.    "The treatment a prisoner receives in prison and the conditions under which (s)he is confined are subject to scrutiny under the Eighth Amendment. This scrutiny includes a duty on prison officials to provide "humane conditions of confinement," which encompasses "a duty ... to protect prisoners from violence at the hands of other prisoners." *Ayotte v. Barnhart,* 973 F.Supp.2d 70, 78 (2013).

122.    When a prison authority ignores a condition of confinement that is "sure or very likely to cause serious illness and needless suffering," a court can find an Eighth Amendment violation. *Helling v. McKinney*, 509 U.S. 25 (1993).

123.    By housing murderer Andrew Balcer and other large intact violent males with non-violent females such as plaintiffs who are half his weight under the circumstances described above -- and enforcing gender orthodoxy under penalty of punishment -  Defendants Liberty and Beal are deliberately indifferent to the substantial risk of serious harm to plaintiffs.

124.    The Department of Corrections and Maine Correctional Center's deliberate indifference for safety, privacy and civil rights of plaintiffs is demonstrated by the statement of Captain RL to Katie Mountain, among other things described herein, when he said, "yes, you should have stayed in that room and got raped until the investigation was substantiated."

125.    Being forced to affirm the delusions of a sexual predator is psychological torture with no rational basis or legitimate government interest.

126.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants Liberty and Beal are enjoined from enforcing 34-A M.R.S. §1208-B(3) and DOC Policies 1.6 and 23.8 et al.

127.    The conditions at the Maine Correctional Center – granting the right of predatory men like Balcer to be housed in the women's facility, forcing plaintiffs to bunk and share a bathroom

and shower with him, the repeated threats, sexual assaults, harassment, the policy against protecting plaintiffs' rights on the basis of her sex, the religious discrimination, retaliation for speaking up, segregation, gas lighting – all of it -- constitutes cruel and unusual punishment in violation of plaintiffs' clearly established rights under Eighth Amendment rights.

128. Pursuant to 42 U.S.C. § 1983 and 1988, Plaintiffs are entitled to declaratory relief, and temporary, preliminary, and permanent injunctive relief, invalidating and restraining enforcement of 34-A M.R.S. §1208-B(3) and DOC Policies 1.6 and 23.8.

129. Plaintiffs also seek an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

130. Plaintiffs have exhausted all administrative remedies as are available pursuant to 42 U.S.C. § 1997d.

### Count Two

### 42 U.S.C. § 1983 – Violation of the Free Speech Clause of the First Amendment and Retaliation for Protected Speech Against Defendants Liberty and Beal in Their Official Capacity

131. Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

132. The law and policies enforced by MCC and the Maine Department of Correction chills plaintiffs' free speech and constitutes an impermissible viewpoint orthodoxy.

133. The First Amendment stands as a shield against any effort to enforce orthodoxy in thought or speech in this country. *Chiles v. Salazar*, 607 U.S. ___ (2026) No. 24-539

134. The Gender ID law and related DOC policies commands staff to address inmates according to their self-proclaimed gender identity and preferred pronouns.

135. The DOC staff require female inmates – many of whom have been victimized by Balcer's **male** violence and involuntary exposure to his penis that he weaponizes with threats of rape -- to **affirm his gender identity** or face punishment.

136. Being forced to affirm the false belief that Andrew Balcer is a woman amounts to the imposition of an established orthodoxy or religion prohibited by the First Amendment.

137. 34-A M.R.S. §1208-B(3) and DOC Policies 1.6 and 23.8 violate the First Amendment both facially and as applied to plaintiffs' clearly established rights to freedom of thought and speech, and the right to be protected from retaliation for exercising such rights that any reasonable official would have understood to be unlawful.

138. Defendants violated plaintiffs' First Amendment rights when they punished Mountain for speaking up about and sending a letter to the press about a matter of public concern – the unbearable conditions of female inmates at the Maine Correction Center – and retaliated against plaintiffs Albert, Sargent and Foster for complaining to MCC and submitted PREA Reports.

139. Because of their protected thoughts and speech, plaintiffs are serving their sentences for nonviolent crimes in segregation, traumatized, and denied virtually every fundamental privilege offered other inmates at the Maine Correctional Center.

140. Plaintiffs also seek an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### Count Three

**42 U.S.C. § 1983 – Violation of the Freedom of Religion Clause of the First Amendment Against Defendants Liberty and Beal in Their Official Capacity**

141. Plaintiffs hereby incorporates by reference each of the preceding paragraphs and allegations as if fully set forth herein.

142. The facts as described herein constitute an ongoing violation by Defendants Liberty and Beal of plaintiffs' rights to religious freedom protected under the First Amendment.

143. 34-A M.R.S. §1208-B(3) and DOC Policies 1.6 and 23.8 facially and as applied to Mountain discriminate against her on the basis of her Baptist faith, and unlawfully compel her to adopt a gender orthodoxy that is inconsistent with her faith, conscience and reality of biological differences between men and women.

144. 34-A M.R.S. §1208-B(3) and DOC Policies 1.6 and 23.8 constitute an impermissible establishment of religion in violation of the First Amendment of all plaintiffs.

145. The actions described herein by Defendants Liberty and Beal – forcing plaintiffs to bunk, shower with and affirm Balcer's gender identity as "female" or face segregation and loss of all privileges have and continue to abridge their religious freedom and cause substantial harm.

146. Plaintiff also seeks an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**Count Four**

**42 U.S.C. § 1983 – Violation of the Equal Protection Clause of the Fourteenth Amendment Against Defendants Liberty and Beal in Their Official Capacity**

147. Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

148. Forced affirmation of Balcer's delusion or sham that he is a woman gives him unfair power he does not deserve and power he exploits at plaintiffs' expense -- based on **his** belief system alone -- regardless how cognitively distorted.

149. There is no rationale or legitimate government interest in "affirming" Andrew Balcer's subjectively designed "gender identity" at the expense of the safety, privacy, and civil rights of plaintiffs, who are female, and deserves to be protected on the basis of their sex.

150. DOC Policy 1.6 explicitly excludes sex as a protected class, therefore plaintiffs' rights on the basis of their female sex are not protected equally under the law in violation of the14th Amendment to the United States Constitution.

151. The female sex class has been erased by the Gender ID law, related DOC policies, and enforcement by Defendants Liberty and Beal who remain deliberately indifferent to their rights as women.

152. The Gender ID law and DOC Policies 1.6 and 23.8 impose a gender orthodoxy that discriminates against the female sex. There are exclusively male facilities and private spaces at the MCC but there are not exclusively female private spaces and facilities.

153. The Equal Protections clause requires that no state shall deny a person equal protection of the law and protects against discrimination against individuals based on arbitrary classification. *Engquist v. Oregon Dep't. of Agr.* 553 U.S. 591, 598 (2008).

154. "Gender identity" is an arbitrary classification.

155. The Constitution's equal protection extends to prisoners, and prison officials cannot discriminate against prisoners based upon membership in a protected class. *Davis v. Powell*, 901 F. Supp. 2d 1196 (S.D. Cal. 2012).

156. Discriminating against individuals on the bases of sex is only justified where there are "exceedingly persuasive" governmental objectives, and that the discriminatory means are substantially related to achieve the government's interest. *United States v. Virginia*, 518 U.S. 515 (1996).

157. Inherent differences between men and women exist, and "the two sexes are not fungible; a community made up exclusively of one sex is different from a community composed of both." *Id.* at 533 (citations omitted).

158. The Gender ID law and related DOC policies overlook legitimate safety and security interest of female inmates by failing to house men and women inmates separate and apart from one another.

159.     There is no rational basis or compelling government interest to "affirm" his gender identity and/or house Andrew Balcer and other violent men with females at the Maine Correctional Center.

160.     Housing all trans-identifying inmates in the women's facility discriminates against the female inmates who are denied safe, private housing separate from males.

161.     The Maine law that requires separating prisoners based on sex, 34 A M.R.S. §3403, serves a legitimate penological purpose of protecting female inmates from violence and abuse by male inmates.

162.     34-A M.R.S. §1208-B(3) and DOC Policies 1.6 and 23.8  require Defendants Liberty and Beal to value the trans-identifying male inmates' housing preferences over the safety and security of female inmates, unconstitutionally impinging on the plaintiffs' rights to equal protection under the law.

163.     Plaintiffs have no adequate remedy at law and do and will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from enforcing 34-A M.R.S. §1208-B(3) and DOC Policies 1.6 and 23.8.

164.     Pursuant to 42 U.S.C. § 1983 and 1988, plaintiffs are entitled to declaratory relief, and temporary, preliminary, and permanent injunctive relief, invalidating and restraining enforcement of 34-A M.R.S. §1208-B(3) and DOC Policies 1.6 and 23.8.

165.     Plaintiffs also seek an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### Count Five

**42 U.S.C. § 1983 – Violation of the Due Process Clause of the Fifth and Fourteenth Amendment Against Defendants Liberty and Beal in Their Official Capacity**

166.     Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

167.    Maine's Gender ID laws including 34-A M.R.S. §1208-B(3) and DOC Policies that include "gender identity" as a protected status are constitutionally void for vagueness.

168.    No ordinary person can understand what "the gender-related identity, appearance, mannerisms or other gender-related characteristics of an individual, regardless of the individual's assigned sex at birth" when "gender" is not defined.

169.    Policy 23.8's definition of gender identity ("a person's sincerely held core belief regarding their gender, whether male, female, both, or neither") is overly vague, arbitrary and forces reasonable people to guess at the law's meaning violating fundamental fairness and notice of what conduct is authorized or prohibited.

170.    Maine's Gender ID laws and related policies fail to set minimum guidelines for enforcement allowing males like Balcer and defendants to act on personal preferences rather than clear legal standards.

171.    Maine's Gender ID laws have a chilling effect regarding speech, thought and conscience.

172.    Men and women of common intelligence are forced to guess what an appropriate "gender identity" is and its accompanying behavior.

173.    Enforcement by defendants of Maine's Gender ID laws violates plaintiffs' rights to due process secured by the Fifth Amendment and Fourteenth Amendment.

174.    Plaintiffs have no adequate remedy at law and do and will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from enforcing Maine's Gender ID laws.

175.    Pursuant to 42 U.S.C. § 1983 and 1988, plaintiffs are entitled to declaratory relief, and temporary, preliminary, and permanent injunctive relief, invalidating and restraining enforcement of 34-A M.R.S. §1208-B(3) and DOC Policies 1.6 and 23.8.

176.    Plaintiffs also seek an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### Count Six

### 5 M.RS. § 4682 – Violation of the Maine Constitution's Free Speech Clause of the First Amendment and Retaliation for Protected Speech Against Defendants Liberty and Beal in Their Official and Individual Capacity

177.    Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

178.    By committing the acts described herein, Defendants Liberty and Beal intentionally interfered with or attempted to interfere with plaintiffs' rights secured by Article 1, Section 4 of the Constitution of the State of Maine, and unlawfully retaliated against them for exercising their free speech rights.

179.    The acts of Defendants Liberty and Beal individually, as supervisors, and policy makers responsible for implementation and enforcement of 34-A M.R.S. §1208-B(3) and DOC Policies 1.6 and 23.8  have caused and continue to cause serious harm that was reasonably foreseeable in violation of plaintiffs' clearly established rights.

180.    Pursuant to 5 M.R.S. § 4682 et seq. plaintiffs bring a claim for legal and equitable relief.

### Count Seven

### 5 M.RS. § 4682 – Violation of the Maine Constitution's Religious Freedom Clause Against Defendants Liberty and Beal in Their Official and Individual Capacity

181.    Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

182.    By committing the acts described herein, Defendants Liberty and Beal intentionally interfered with or attempted to interfere with plaintiffs' rights secured by Article 1, Section 3 of

the Constitution of the State of Maine, and unlawfully retaliated against them for exercising their rights.

183.     The acts of Defendants Liberty and Beal individually, as supervisors, and policy makers responsible for implementation and enforcement of 34-A M.R.S. §1208-B(3) and DOC Policies 1.6 and 23.8  have caused and continue to cause serious harm that was reasonably foreseeable in violation of plaintiffs' clearly established rights.

184.     Pursuant to 5 M.R.S. § 4682 et seq. plaintiffs bring a claim for legal and equitable relief.

## Count Eight

**5 M.RS. §§ 4591, 4682 – Violation of the Maine Constitution's Equal Protection Clause and Human Rights Act Against Defendants Liberty and Beal in Their Official and Individual Capacity**

185.     Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

186.     By committing the acts described herein, Defendants Liberty and Beal intentionally interfered with or attempted to interfere with plaintiffs' rights secured by Article 1, Section 6-A of the Constitution of the State of Maine, and unlawfully retaliated against them for exercising their rights.

187.     The acts of Defendants Liberty and Beal individually, as supervisors, and policy makers responsible for implementation and enforcement of 34-A M.R.S. §1208-B(3) and DOC Policies 1.6 and 23.8  have caused and continue to cause serious harm that was reasonably foreseeable in violation of plaintiffs' clearly established rights.

188.     Defendants Liberty and Beal knew or should have known that eliminating protection under Department of Corrections Policy 1.6 on the basis of sex was beyond the scope of their authority, unlawful and in violation of plaintiffs' rights as women – adult female humans -

secured by the Maine Constitution, the Maine Civil Rights Act and Maine Human Rights Act, 5 M.R.S. §4591.

189.  By erasing the female sex class from the roster of groups deserving protection from discrimination at the Maine Correctional Center and MCC, Defendants Liberty and Beal have discriminated against plantiffs because of their sex.

190.  Pursuant to 5 M.R.S. § 4682 et seq. Mountain brings a claim for legal and equitable relief.

### Count Nine

### 5 M.RS. § 4682 – Violation of the Maine Constitution's Clause Against Cruel and Unusual Punishment against Defendants Liberty and Beal in Their Official and Individual Capacity

191.  Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

192.  By committing the acts described herein, Defendants Liberty and Beal intentionally interfered with or attempted to interfere with plaintiffs' rights secured by Article 1, Section 9 of the Constitution of the State of Maine.

193.  The acts of Defendants Liberty and Beal individually, as supervisors, and policy makers responsible for implementation and enforcement of 34-A M.R.S. §1208-B(3) and DOC Policies 1.6 and 23.8  have caused and continue to cause serious harm that was reasonably foreseeable in violation of plaintiffs' clearly established rights.

194.  Pursuant to 5 M.R.S. § 4682 et seq. plaintiffs bring a claim for legal and equitable relief.

### Count Ten

### Civil Rights Violation, Assault, Intentional infliction of Emotional Distress against Andrew Balcer

195.    Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

196.    By committing the above-described acts, Defendant Balcer violated the Maine Civil Rights Act and caused plaintiffs' substantial, severe, and lasting harm.

197.    By committing the above-described acts, Defendant Andrew Balcer is liable to plaintiffs for assault.

198.    By committing the above-described acts, intentionally and with malice, Defendant Andrew Balcer is liable to plaintiffs for negligent and intentional infliction of emotional distress.

199.    By committing the above-described acts, intentionally with malice, Defendant Andrew Balcer is liable to plaintiffs for damages, including punitive damages.

### Demand For Jury Trial

200.    Plaintiffs demand a jury trial on all claims they have a right thereto.

### Prayer for Relief

**WHEREFORE**, Plaintiffs respectfully request this court to enter judgment for them and an order against Defendants as follows:

1.    An order and judgement declaring Maine's Gender ID laws, including 34-A M.R.S. §1208-B(3) and DOC Policies 1.6 and 23.8, facially and as applied to plaintiffs, violate the Cruel and Unusual Punishment clauses of the U.S. and Maine Constitutions; the Free Exercise of Religion and Establishment clauses of the U.S. and Maine Constitutions; the Freedom of Speech clauses of the U.S. and Maine Constitutions; the Due Process clauses of the U.S. and Maine Constitutions; and the Equal Protections Clauses of the U.S. and Maine Constitutions;

2.  An order permanently enjoining and prohibiting Defendants Liberty and Beal in their official capacity from enforcing §1208-B(3) and DOC Policies 1.6 and 23.8 or otherwise interfering with Plaintiff's federally protected rights and guarantees;

3.  Judgement and award of damages, nominal or compensatory, and an injunction against Defendants Liberty and Beal for violation of the Maine Civil Rights Act and Maine Human Rights Act;

4.  Judgement and award of damages – nominal, compensatory and punitive – against Defendant Balcer;

5.  For attorneys' fees and costs; and

6.  Such other and further relief as the Court deems appropriate and just.

Dated May 9, 2026

/s/ *Cynthia A. Dill*
Cynthia A. Dill
Attorney for Plaintiffs
Maine Bar # 7055

The Law Office of Cynthia Dill
1227 Shore Road
Cape Elizabeth, Maine 04107
207-747-4172
cynthia@dillesquire.com